304 Ga. 21
FINAL COPY

S18A0586.  CARMAN v. THE STATE.

HINES, Chief Justice.

Demario Carman, along with three other men, was indicted for murder, armed robbery, and related crimes in connection with the death of Vanessa Thrasher at O.T.'s Lounge in Atlanta, Fulton County, Georgia, on August 16, 2012.  The State gave notice of its intent to seek the death penalty, and the guilt/innocence phase of Carman's trial began on November 17, 2014.  As outlined in more detail below, the trial court declared a mistrial during the latter half of the guilt/innocence phase of Carman's trial.  In this appeal, Carman contends that his right not to be subjected to double jeopardy and his right to counsel of his choosing would be violated if he were subjected to a new trial following the mistrial.  For the reasons set forth below, we affirm the trial court's denial of Carman's plea in bar, and we thereby return jurisdiction to the trial court for the purpose of its conducting a new trial.[1]

---

[1] This case was previously docketed in this Court as Case No. S16A1002 and was orally argued on July 18, 2016, but the case was stricken from the docket and remanded to the trial court

1. At a hearing held on January 28, 2013, the trial court approved Christian Lamar to serve as lead counsel for Carman and Kimberly Staten-Hayes to serve as co-counsel, and they represented Carman throughout the nearly two years of his pretrial proceedings and trial preparation. On October 24, 2014, which was just 11 days before voir dire began, Gabrielle Pittman filed a notice of appearance to join the defense team.

The jury was sworn and testimony began on Monday, November 17, 2014. The trial court had previously announced its intention to conduct the trial until the end of the day on Tuesday, November 25, and then to take a recess for Thanksgiving from Wednesday, November 26, up to and including Monday, December 1. However, on Wednesday, November 19, just before 11:00 a.m., the testimony of the ninth of the State's anticipated 18 witnesses for its case-in-chief in the guilt/innocence phase was interrupted when Ms. Staten-Hayes approached the bench off the record and the trial court dismissed the jury. Ms. Staten-Hayes informed the trial court on the record that she had approached the bench because of an evidentiary matter, which

for the complete record to be assembled and transmitted to this Court. As this Court's remand order specified, the briefs previously filed have been filed under a new case number, Case No. S18A0586. Each of the Justices who were not present at the previous oral arguments have viewed the recording of those arguments, and, as our remand order also specified, we deem further oral arguments concerning the same briefs to be unnecessary.

the trial court ruled on. The trial court then ordered a recess to last approximately 15 minutes.

After the recess, the trial court announced, "we have had an emergency occur," explaining:

> Ms. Staten-Hayes received a communication when we were on the break that her niece attempted to commit suicide, and as a consequence of that, she is and — is emotionally distraught, and I can vouch for that because that's the reason you saw me going through the door and going into the women's bathroom.

The trial court announced:

> Given Ms. Staten-Hayes's circumstances, we absolutely will not be proceeding today. What is going to occur at this point is I will give both sides an opportunity to state their position about whether I should declare a mistrial or whether this trial should be delayed.

Mr. Lamar informed the trial court that he and Carman's other counsel had discussed the matter with Carman, and Mr. Lamar proposed a 13-day continuance until the Tuesday after Thanksgiving, December 2, which he said would allow him and Ms. Pittman to "come up to speed" in case Ms. Staten-Hayes could not return. The State joined that proposal, but it asked the trial court to ensure that Carman, in seeking the 13-day continuance, was committing "to the fact that if Ms. Staten-Hayes is not in the position to

proceed, that he would be willing to proceed with his other counsel of record on December 2."

When questioned by the trial court, Mr. Lamar explained that Ms. Staten-Hayes had been responsible for preparing for the guilt/innocence phase and that Mr. Lamar had been responsible for preparing for the sentencing phase. Mr. Lamar also stated that Ms. Pittman had joined the defense team just two weeks prior to voir dire, that it had been intended that she would participate only in jury selection, that she had done other, unspecified things for the defense since then, and that she would not be prepared to catch up on nearly two years of preparation but could be prepared for "targeted things." Mr. Lamar also stated that his proposal for a continuance was acceptable to Carman personally. The trial court expressed its concern that the issue of Carman's representation would become an issue on appeal and on habeas corpus, and it noted that the jurors might become "frustrated" and "should not be concerned about any personal issues associated with either side." The trial court continued:

> And I understand that as he sits here now, Mr. Carman may very well want to proceed, and I understand why everybody may very well want to proceed because I realize it's been a long road, and people want it over. And they want it to be done. But how it is done matters. It matters for both sides. So I'm sorry that we are

where we are, but I cannot, in good conscience, say we will proceed with this trial. Because the fact is Ms. Staten-Hayes has been Mr. Carman's lawyer for the last two years. This case was prepared by Mr. Carman's counsel with the intention that she would be the person who would handle the guilt-innocence phase. Now, I understand that everybody wants to continue, but it would be an injustice to do so, not just to Mr. Carman, but to Ms. Thrasher's [the victim's] family. Because when this is done, it needs to be done for everybody. And if we have to do it again, it should not be because we decided to do what was expedient now at the expense of being able to defend the decisions that we're making. So this trial will end because given Ms. Staten-Hayes's current mental condition, it is this court's judgment that she is not in a position to give Mr. Carman the representation that he deserves.

Ms. Staten-Hayes then spoke in favor of a continuance, stating regarding her niece, "[W]hat I was hoping is that if the court would just give me a couple of days to check on her." Upon questioning by the trial court, she explained that her niece was the only child of her sister who had died that summer, that her niece's father lived in Nashville, Tennessee, and that her niece had made a serious suicide attempt and was in the hospital at Vanderbilt University. When asked by the trial court, she admitted that she would want to stay in Nashville if she were gone for two days and learned that her niece needed her. She told the trial court, "If the court could hold off on making this decision at least until I talk to [my brother-in-law], if he tells

me she's going to be okay, I can shoot there and get back." Mr. Lamar stated

his agreement with this request. The trial court replied:

> Well, let me tell you what I'm not going to do. I'm not going to put a human being in the position of if they think they need to stay with someone who has committed [sic] suicide, they're debating w[h]ether or not to do that, or say: Yep, let's just go forward with the trial because, you know, they gave me this time, and I feel bad.

The trial court then again stated its intention to grant a mistrial, adding, "[I]n

fairness to [Carman], and in fairness to the Thrasher family, we're not

proceeding."

Mr. Lamar then made a final request for a continuance of 13 days,

explaining that the jury would not need to be informed of the reason for the

delay and stating: "So we're asking the court for that time. The court can

still declare a mistrial. But we're just asking for that time to figure out, like

you said, maybe we can go forward, maybe we can't." The trial court

replied, "I can tell you now, you are not going to go forward with a lawyer

who just got this case when you and Ms. Staten-Hayes have had it for two

years." The trial court then added, "And I'm not going to put her in a

position of having to decide between her niece and this trial." Mr. Lamar and

the State each renewed their objections to a mistrial. The trial court then released the jury.

After a recess, the trial court reiterated its reasoning in granting a mistrial:

> The court, after hearing all of the circumstances associated with this matter, and for the reasons stated previously, finds that the declaration of a mistrial is a manifested [sic] necessity, that the failure to declare a mistrial would — if this trial were to continue — result in a set of circumstances that the court does not believe could be defended, both with respect to any verdict which might be returned, and should the matter be taken up on appeal at some later point in time.

The trial court then allowed the defense to "expand upon [its] objection." Mr. Lamar stated that Carman "was prejudiced" because the defense had already "revealed [its] theory in the case." The trial court replied:

> At this point everybody has revealed their theory of the case, and the circumstances that came up were absolutely unforeseen, and in light of weighing the potential prejudice associated with requiring him to proceed with new counsel on such notice, potentially, as well as the clear emotional state of his current counsel, which the court finds to be entirely reasonable and justified, it is the court's view that the balance of equities would make it appropriate to declare a mistrial.

The trial court then concluded the proceedings.

After the mistrial was declared, Carman filed a plea in bar, arguing that a new trial would constitute double jeopardy, and the trial court denied that motion and a motion to reconsider. This case is properly before this Court as a direct appeal, because the appeal of a denied plea of double jeopardy is subject to the collateral order doctrine. See *Patterson v. State*, 248 Ga. 875, 875-877 (287 SE2d 7) (1982).

2. Carman contends that allowing him to be subjected to a second trial, after the trial court granted the mistrial in his first trial, will subject him to double jeopardy in violation of the Fifth Amendment to the Constitution of the United States, the Georgia Constitution, and the Georgia Code.[2] There is no dispute that jeopardy attached during Carman's first trial, as the jury in that trial had been sworn before the mistrial was declared. See *Crist v. Bretz*, 437 U. S. 28, 38 (II) (B) (98 SCt 2156, 57 LE2d 24) (1978) ("The federal rule

---

[2] The Fifth Amendment provides: "No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb. . . ." The Georgia Constitution provides: "No person shall be put in jeopardy of life or liberty more than once for the same offense except when a new trial has been granted after conviction or in case of mistrial." Ga. Const. of 1983, Art. I, Sec. I, Par. XVIII. The Georgia Code provides:

> (a) A prosecution is barred if the accused was formerly prosecuted for the same crime based upon the same material facts, if such former prosecution: . . . (2) Was terminated improperly after the jury was impaneled and sworn or, in a trial before a court without a jury, after the first witness was sworn but before findings were rendered by the trier of facts or after a plea of guilty was accepted by the court. . . .

OCGA § 16-1-8.

that jeopardy attaches when the jury is empaneled and sworn is an integral part of the constitutional guarantee against double jeopardy."); OCGA § 16-1-8 (a) (2). In determining whether a second trial is permitted on the same charges following a mistrial, our case law has treated all forms of double jeopardy claims, whether under the Constitution of the United States, under the Georgia Constitution, or under the Georgia Code, in a manner consistent with case law from the United States Supreme Court regarding the Fifth Amendment, and we do so below regarding Carman's claims. See *Burleson v. State*, 259 Ga. 498, 498 (384 SE2d 659) (1989) (equating all such forms of double jeopardy claims). See also *Benton v. Maryland*, 395 U. S. 784, 794 (III) (89 SCt 2056, 23 LE2d 707) (1969) ("[W]e today find that the double jeopardy prohibition of the Fifth Amendment represents a fundamental ideal in our constitutional heritage, and that it should apply to the States through the Fourteenth Amendment.").[3]

---

[3] As we have noted, many questions of double jeopardy are properly addressed under Georgia's double jeopardy statutes. See *Prater v. State*, 273 Ga. 477, 480 (4) (545 SE2d 864) (2001). See also *Stephens v. Hopper*, 241 Ga. 596, 598-599 (1) (247 SE2d 92) (1978) (noting that "the 1968 Georgia Criminal Code provide[d] new, expanded statutory tests" regarding "two aspects of double jeopardy — first limitations upon multiple prosecutions for crimes arising from the same conduct (referred to as the *procedural* bar of double jeopardy); and, second, limitations upon multiple convictions or punishments that may be imposed for such crimes (referred to as the *substantive* bar of double jeopardy)" (emphasis in original)).

(a)  We first consider the general governing case law in this field.  The United States Supreme Court first addressed whether the sua sponte granting of a mistrial prior to the jury's verdict bars further prosecution in 1824 in a case where the jury was unable to agree on a verdict, and the Court held as follows:

> We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a *manifest necessity* for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere.  To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favour of the prisoner.  But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office.

*United States v. Perez*, 22 U. S. 579, 580 (6 LE 165) (1824) (emphasis supplied).  Regarding how deference will be applied to the question of the necessity for a mistrial, the Supreme Court has clarified as follows:

> Nevertheless, those words [manifest necessity] do not describe a standard that can be applied mechanically or without attention to the particular problem confronting the trial judge.  Indeed, it is manifest that the key word "necessity" cannot be interpreted

literally; instead, contrary to the teaching of Webster, we assume that *there are degrees of necessity and we require a "high degree"* before concluding that a mistrial is appropriate.

*Arizona v. Washington*, 434 U. S. 497, 506 (II) (98 SCt 824, 54 LE2d 717) (1978) (footnotes omitted; emphasis supplied).

The Supreme Court has also stated, at least regarding cases not involving bad faith by the prosecution or the trial judge, "[t]he decision whether to grant a mistrial is reserved to the '*broad discretion*' of the trial judge." *Renico v. Lett*, 559 U. S. 766, 774 (II) (130 SCt 1855, 176 LE2d 678) (2010) (quoting *Illinois v. Somerville*, 410 U. S. 458, 462 (II) (93 SCt 1066, 35 LE2d 425) (1973) (emphasis supplied)). See *Harvey v. State*, 296 Ga. 823, 831-832 (2) (a) (770 SE2d 840) (2015) ("The decisions of this Court and the U. S. Supreme Court emphasize that whether the required degree of necessity for a mistrial has been shown is a matter best judged by the trial court. . . . Where it is clear from the record that the trial court actually exercised its discretion in deciding to grant a mistrial, the Double Jeopardy Clause generally will not bar retrial.").

> This is not to say that we grant *absolute* deference to trial judges in this context. . . . Thus, "if the trial judge acts for reasons completely unrelated to the trial problem which purports to be the basis for the mistrial ruling, close appellate scrutiny is

> appropriate." [Cit.] Similarly, "if a trial judge acts irrationally or irresponsibly, . . . his action cannot be condoned." [Cit.]

*Lett*, 559 U. S. at 775 (II) (quoting *Washington*, 434 U. S. at 510 n.28, 514 (III)). See *Meadows v. State*, 303 Ga. 507 (813 SE2d 350) (2018) (reversing where the trial court granted a mistrial due to concerns for jury safety based on the reports of a bailiff, without ever asking the jurors if any of them felt unsafe). The Supreme Court has since given deference to the trial courts to grant mistrials where a variety of circumstances, other than the unpreparedness of the prosecution to prove its case or bad faith on the part of the trial judge, have interfered with the progress or fairness of trials. See, e.g., *Wade v. Hunter*, 336 U. S. 684 (69 SCt 834, 93 LE 974) (1949) (allowing a second court martial after a first court martial was terminated because witnesses were located far from the tribunal after the front line of battle had advanced); *Simmons v. United States*, 142 U. S. 148, 154-155 (12 SCt 171, 35 LE 968) (1891) (holding that a second trial was permitted after a mistrial was declared upon the discovery of an undisclosed bias of a juror). Cf. *Downum v. United States*, 372 U. S. 734, 737-738 (83 SCt 1033, 10 LE2d 100) (1963) (discussing the consequences of a mistrial declared upon the prosecution's unpreparedness to prove its case).

The deference to the trial courts afforded by the Supreme Court has also been applied where the exact circumstances motivating the trial court's actions were unclear, especially where the trial court's motivation was clearly not to favor the prosecution. See *Gori v. United States*, 367 U. S. 364, 367 (81 SCt 1523, 6 LE2d 901) (1961). Notably, the Supreme Court has emphasized:

> Where, for reasons deemed compelling by the trial judge, who is best situated intelligently to make such a decision, the ends of substantial justice cannot be attained without discontinuing the trial, a mistrial may be declared without the defendant's consent and over his objection, and he may be retried consistently with the Fifth Amendment.
> . . .
> Suffice that we are unwilling, where it clearly appears that a mistrial has been granted in the sole interest of the defendant, to hold that its necessary consequence is to bar all retrial. It would hark back to the formalistic artificialities of seventeenth century criminal procedure. . . . We would not thus make [the trial courts] unduly hesitant conscientiously to exercise their most sensitive judgment — according to their own lights in the immediate exigencies of trial — for the more effective protection of the criminal accused.

Id. at 368-370. That deference to the trial courts based on the interests of the defendant, however, is not applied in an idle manner. The Supreme Court has held:

> At times the valued right of a defendant to have his trial completed by the particular tribunal summoned to sit in judgment

> on him may be subordinated to the public interest — when there is an imperious necessity to do so.

*Downum*, 372 U. S. at 736. Thus, the Supreme Court has held that, even though one might conclude that a defendant actually gained some benefit from a mistrial, such a benefit, except where a defendant has requested a mistrial, does not in itself authorize a future prosecution. This is true because a defendant, regardless of whether he or she might gain *some* benefit from a new trial, retains a qualified right "to go to the first jury and, perhaps, end the dispute then and there with an acquittal." *United States v. Jorn*, 400 U. S. 470, 482-484 (II) (91 SCt 547, 27 LE2d 543) (1971) (plurality opinion) (discussing *Gori*, 367 U. S. 364, but concluding that "a limitation on the abuse-of-discretion principle based on an appellate court's assessment of which side benefited from the mistrial ruling does not adequately satisfy the policies underpinning the double jeopardy provision"). See *Somerville*, 410 U. S. at 471 (III) ("Nor will the lack of demonstrable additional prejudice preclude the defendant's invocation of the double jeopardy bar in the absence of some important countervailing interest in the proper judicial administration."). The focus, where a benefit to the defendant appears to have been contemplated in the granting of a mistrial, is on whether that

benefit was of a sort designed to ensure that the ends of justice would be served.  Thus,

> independent of the threat of bad-faith conduct by judge or prosecutor, . . . the *Perez* doctrine of manifest necessity stands as a command to trial judges not to foreclose the defendant's option until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings.

*Jorn*, 400 U. S. at 485 (II).

(b)  Turning more specifically to Carman's case, we note that, even in discussing the need for such a "scrupulous exercise of judicial discretion," *Jorn*, 400 U. S. at 485 (II), the Supreme Court made the following acknowledgment:

> [I]t is also true that a criminal trial is, even in the best of circumstances, a complicated affair to manage.  The proceedings are dependent in the first instance on the most elementary sort of considerations, e.g., the health of the various witnesses, parties, attorneys, jurors, etc., all of whom must be prepared to arrive at the courthouse at set times.

Id. at 479-480 (II).  See also *United States v. Wayman*, 510 F2d 1020, 1028 (VIII) (5th Cir. 1975) (approving the granting of a mistrial where "trial counsel was injured in an automobile wreck and was unable to continue the trial").  Thus, throughout our consideration of the trial court's decision to declare a mistrial in Carman's case, we rightfully remain mindful that that

decision involved the emotional health and ability to proceed of one of the two attorneys who had spent nearly two years preparing Carman's case for trial and whose absence, at least arguably, might not have simply harmed Carman but might have significantly frustrated the ends of public justice.

Carman argues that the trial court's stated concern about future appeals regarding counsel's representation amounted to a substitution of defense strategy and did not constitute a manifest necessity. However, the trial court had a valid concern that Carman's representation might be inadequate. This concern was voiced in terms of the likelihood of reversal on appeal or relief on habeas corpus, which would render the trial an exercise in futility. See *Somerville*, 410 U. S. at 469 (III) (affirming where a mistrial was declared because the indictment was fatally flawed and stating that "[i]f a mistrial were constitutionally unavailable in situations such as this, the State's policy [regarding indictments] could only be implemented by conducting a second trial after verdict and reversal on appeal, thus wasting time, energy, and money for all concerned"). Furthermore, the trial court's *core* concern, however phrased, was that Carman should have adequate representation in the interest of justice. See *United States v. Gomez*, 120 Fed. Appx. 930, 933 (IV) (3d Cir. 2005) ("The District Court's interest in protecting Gomez's

Sixth Amendment right to effective counsel competed with Gomez's right to have his trial completed by a particular tribunal. . . . The District Court's resolution of the tension between Gomez's Fifth and Sixth Amendment rights in this context is entitled to substantial deference."). As the trial court explicitly identified, a concern for the interest of justice, including a concern that adequate counsel be provided to an indigent defendant, properly encompasses a consideration of the interests not only of the defendant but also of the public. See *Wade*, 336 U. S. at 689 ("[A] defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments.").

Carman argues that the trial court abused its discretion by resting its decision to grant a mistrial on an incorrect understanding of the Unified Appeal Procedure. See *Otis v. State*, 298 Ga. 544, 544-545 (782 SE2d 654) (2016) (holding that the trial court's declaration of a mistrial was based on an incorrect understanding of a legal issue and concluding that, "[a]ccordingly, the circumstances in th[e] case did not demand entry of mistrial"). Specifically, Carman argues that the Unified Appeal Procedure simply requires the appointment of two attorneys who meet specified "minimum

qualifications," and he argues that Ms. Pittman met the requirements to replace Ms. Staten-Hayes as Mr. Lamar's co-counsel.  UAP II (A).  We find no error.  First, Carman's assertion is not supported by the record, because, as Carman himself acknowledges, the trial court made no reference to the Unified Appeal Procedure in considering and then declaring a mistrial. Instead, the trial court referred repeatedly to two core concerns:  (1) Ms. Staten-Hayes was effectively incapacitated as counsel and should not be relied upon to determine the timing of her return to court under the circumstances; and (2) Ms. Pittman, regardless of the fact that she was qualified under the Unified Appeal Procedure, was simply unprepared to serve as Carman's sole co-counsel.  Second, even if the trial court *had* referred to the Unified Appeal Procedure as a factor supporting its exercise of discretion in declaring a mistrial, doing so would not have been unjustified. Obviously, the requirements of the Unified Appeal Procedure must yield to constitutional mandates wherever they are in conflict, including the constitutional mandates governing the declaration of mistrials.  Cf. *Waldrip v. Head*, 279 Ga. 826, 827 (II) (A) (620 SE2d 829) (2005) (holding that the work product doctrine as interpreted by this Court must "yield to" constitutional mandates if the two are in conflict).  However, it would not

have been error for the trial court to weigh the Unified Appeal Procedure's concern for the appointment of qualified counsel as it exercised the discretion afforded to it under constitutional mandates regarding mistrials.

Carman argues that the trial court rushed to declare a mistrial; however, we disagree with his characterization of the facts. As the United States Supreme Court has itself done in the past, we find it highly relevant here that the trial court in Carman's case, rather than acting abruptly, gave both parties an ample opportunity to discuss the alternatives to a mistrial prior to making a ruling. Compare *Washington*, 434 U. S. at 515-516 (III) ("The trial judge did not act precipitately. . . . On the contrary, evincing a concern for the possible double jeopardy consequences of an erroneous ruling, he gave both defense counsel and the prosecutor full opportunity to explain their positions on the propriety of a mistrial.") with *Jorn*, 400 U. S. at 487 (III) (plurality opinion) (finding a double jeopardy bar where "the trial judge acted so abruptly in discharging the jury" that the parties were unable to offer alternatives or make objections). Carman's case does not involve the failure of the trial court to take even a short recess in order to inquire into the circumstances at hand. Cf. *Meadows*, 303 Ga. at 513-514 (2) (b), (c) (finding the trial court's declaration of a mistrial improper where "the trial court did

nothing to try to confirm the deputy's reports with the jurors by asking if any of them felt the least bit unsafe during their deliberations" and failed to consider obvious alternatives to a mistrial); *Love v. Morton*, 112 F3d 131, 137 (III) (3d Cir. 1997) (finding a mistrial to have been improper where the trial judge learned of the death of his mother-in-law but failed to allow the parties to present alternatives, including a one-day continuance to allow a new judge to take over); *Mizell v. Attorney Gen. of New York*, 586 F2d 942, 947 (2d Cir. 1978); *United States v. Tinney*, 473 F2d 1085, 1089 (3d Cir. 1973). Instead, the trial court in Carman's case took such a recess, inquired further into the circumstances at hand, allowed extensive argument, and only then concluded that a 13-day continuance would not be sufficient to serve the interests of justice. Cf. *Thomason v. State*, 620 S2d 1234, 1239 (Fla. 1993) (cataloguing similar cases and concluding: "[T]he trial judge, while clearly well-intentioned, *did not discuss alternatives* before declaring a mistrial over the objection of the defendant's counsel and the State." (emphasis supplied)).

The trial court in Carman's case initially expressed some concern about the effect of a 13-day continuance on the jury and its ability to be fair. Although the trial court did not question the jury on the matter, we conclude for two reasons that the trial court's discretion was not abused by its failure

to do so. First, at times such a direct inquiry may be desirable yet still not be absolutely necessary. See *Lett*, 559 U. S. at 779 (III) (stating, "we do not deny that the trial judge could have been more thorough," but finding that such additional thoroughness was not constitutionally required). See also *State v. Anderson*, Nos. CR04276040T, CR04275960T, 2008 Conn. Super. LEXIS 1431, at *11 (II) (Conn. Super. Ct. May 29, 2008) (holding that "[p]olling the jury would have been futile" because the seriously ill prosecutor "could not indicate to the court when he would be able to return"). Furthermore, and more importantly, the totality of the trial court's comments, particularly those following the suggestion by Carman's lead counsel that the jury could be left unaware of the reason for a continuance, shows that the trial court's core focus was on whether a 13-day continuance would be sufficient to ensure that Carman's trial was conducted in a manner that served the ends of justice in light of the severe emotional distress of his co-counsel of two years and the unpreparedness of the third attorney who had only two weeks before joined the case.

As defense counsel suggested to the trial court, it *could* have delayed ruling on a possible mistrial until after a shorter continuance and a further report from the defense about whether Carman's co-counsel of two years felt

that she could return or whether any new arguments could be raised regarding the ability of his lead counsel to proceed without her assistance. However, the trial court clearly stated that it had considered the relevant circumstances, which included a serious suicide attempt by the affected attorney's close family member who had recently lost her mother, the trial court's direct observation of the attorney's severe emotional distress, the trial court's concern that the attorney would not be in a sound position to decide whether she could or should return following a shorter continuance, and the unpreparedness of the other attorney available to serve. See *State v. Saavedra*, 766 P2d 298, 303 (N.M. 1988) ("Saavedra argues the judge should have granted the continuance instead of jumping to the conclusion that defense counsel would not be up to the strain of continuing with trial. . . . Although it may have been the better course, we do not believe that the Constitution [of the United States] required the trial court to grant the defendant's request for a one week continuance in order to make a more 'scrupulous' choice than the one in fact made." (citing *Jorn*, 400 U.S. at 487 (III) (plurality opinion)). As another court has noted, the "*best* practice may favor allowing for a severance or mistrial where the prolonged illness or absence of a defense counsel would require substitution." *United States v.*

*Bell*, 795 F3d 88, 95-96 (II) (B) (D.C. Cir. 2015) (emphasis supplied). See *State v. Kirby*, 236 SE2d 33, 35 (S.C. 1977) (reversing the trial court's granting of the defendant's plea of double jeopardy where the prosecutor had unexpectedly died during the trial and where the assistant prosecutor "was totally unprepared to prosecute the remainder of the case" and "was in no emotional condition to continue the case").

Even if *we* might have chosen a different course in Carman's case as trial judges, the discussion above shows that the course chosen by Carman's trial court was not unreasonable. See *Tubbs v. State*, 276 Ga. 751, 754 (3) (583 SE2d 853) (2003) ("A trial judge has acted within his sound discretion in rejecting possible alternatives and in granting a mistrial, if reasonable judges could differ about the proper disposition." (citation and punctuation omitted)). Accordingly, we conclude that the trial court did not abuse its discretion in declaring a mistrial and, in turn, denying Carman's plea in bar based on alleged double jeopardy.

3. Carman makes an alternative argument in which he claims that the trial court denied him the right to his counsel of choice without justification. As Carman notes in his appeal, this Court has held that a trial court abuses its discretion when it refuses, in selecting counsel for an indigent defendant, "to

give sufficient weight to the defendant's 'relationship of trust and confidence with prior counsel' and to prior counsel's familiarity with the 'legal and factual complexities of the case.'" *Grant v. State*, 278 Ga. 817, 817 (1) (607 SE2d 586) (2005) (quoting *Amadeo v. State*, 259 Ga. 469, 470-471 (2) (384 SE2d 181) (1989)). However, the action taken by the trial court was not to force unwanted representation on Carman but, instead, to abandon a trial already underway where the trial court did not believe that one of Carman's two existing attorneys, who had been preparing his case for two years and had primary responsibility for the guilt/innocence phase, would be in a sound position to consider returning to represent him following the 13-day continuance that Carman's lead counsel had requested. Furthermore, our review of the record reveals that Carman did not preserve this issue regarding his choice of counsel for appellate review by raising it in the trial court. See *Butts v. State*, 273 Ga. 760, 771 (31) (546 SE2d 472) (2001) (noting the general rule that, where "trial counsel failed to obtain a ruling from the trial court on [a given] issue, it is waived for purposes of appeal").

Judgment affirmed. All the Justices concur, except Melton, P. J., who concurs in judgment only.

Decided June 18, 2018.

Murder. Fulton Superior Court. Before Judge Russell.

Gabrielle A. Pittman, Kimberly A. Staten-Hayes, Christian G. Lamar, Christina P. Rudy, for appellant.

Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder, Kevin C. Armstrong, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, for appellee.